Argued January 15, reversed March 26, 1958

McCORMICK *v.* CAMPBELL ET AL

323 P. 2d 322

*William K. Shepherd,* of Portland, argued the cause for appellants, J. C. Campbell and John H. Miller. With him on the brief was Charles M. Lovett, of Portland.

*Carl Robert Wells,* Portland, argued the cause for respondent Lloyd M. McCormick. On the brief were McCormick & Wells, of Portland.

*Nathan L. Cohen,* of Portland, argued the cause for respondent Ray H. Lesher.

Before PERRY, Chief Justice, and ROSSMAN, BRAND and McALLISTER, Justices.

BRAND, J.

This is a suit for an accounting brought by plaintiff Lloyd M. McCormick against defendants J. C. Campbell and John H. Miller, dba Dr. J. C. Campbell, Dentist. There was a decree for plaintiff and for petitioner Ray H. Lesher, a referee appointed by the court, and defendants appeal.

The following facts are alleged and admitted and are therefore taken as true: The plaintiff and defendants were Doctors of Dental Medicine, duly licensed to practice the profession of dentistry in the State of Oregon. Defendants J. C. Campbell and John H. Miller were partners doing business under the name and style of Dr. J. C. Campbell, Dentist, at 359 S. W. Morrison Street in Portland. On or about 17 August 1951 defendants employed plaintiff to conduct that business in consideration of payment to him of a monthly salary based on an annual wage of $12,500.00, or $1,041.66 per month, "together with a further sum equivalent to 40% of the net profits of said business during the period of plaintiff's employment." Plaintiff was employed by defendants according to an oral agreement between the parties whereby on 17 August 1951 he was

employed to conduct the business for a period of six months, and on 1 February 1952 was employed to conduct the business for an additional six-months period, and on 1 August 1952 was employed to conduct the business for an additional six-months period, and on 1 February 1953 was employed to conduct the business on a month-to-month basis, the employment being terminable by either plaintiff or defendants upon the giving of thirty days notice to the other. Defendants agreed to account to plaintiff for the net profits of the business during the period of his employment and to pay plaintiff his percentage thereof at the termination of each of the periods of his employment or at the final termination of his employment, whichever time he might desire. Defendants terminated the plaintiff's employment, effective 24 October 1953. At all times during the period of plaintiff's employment "all books records, papers and any and all other documents relating to the expenses and receipts of the dental business mentioned in plaintiff's complaint were and now are in the possession and control of defendants or their agents. * * * The main portion of defendants' said business was conducted by extending credit to the patients thereof for professional dental services."

We now turn to the disputed matters set forth in the pleadings. Plaintiff alleges that defendants breached the contract

"in that on October 24, 1953, defendants terminated plaintiff's said employment without notice and without accounting to plaintiff for the net profits of said business for the period August 17, 1951, to October 24, 1953, or for any period, and without tendering or paying to plaintiff any sum or sums on account of his agreed percentage of said net profits, or any part thereof."

Demand for accounting and payment and refusal by the defendants to account or pay is alleged. These allegations are denied except as to the termination of employment as stated supra.

The plaintiff makes the following allegations, all of which are denied: He alleges full performance on his part, and that

"during the period of plaintiff's employment said business made a profit, the exact amount of which is unknown to plaintiff but which plaintiff alleges was and is the approximate sum of $20,000.00, and as a proximate result of defendants' said breach of plaintiff's contract of employment plaintiff has been wrongfully deprived of his agreed percentage of said net profit, to his damage in the approximate sum of $8,000.00."

He also alleges:

"As a direct and proximate result of defendants' said breach of plaintiff's contract of employment in terminating plaintiff's employment without notice, plaintiff has lost and has been wrongfully deprived of one month's salary, to his damage in the sum of $1,041.66."

Plaintiff then asks for an accounting to plaintiff for the expenses and receipts of the business during the period of his employment. The plaintiff further alleges:

"* * * it was understood and agreed by and between plaintiff and defendants that in determining the net profits of said business, the amounts payable thereto by patients for professional services rendered by plaintiff should be included in the receipts of said business and that plaintiff's percentage of said net profits should include said agreed percentage of such amounts payable, and defendants now are collecting such said accounts and disposing of same so collected and defendants threaten to continue so to collect said accounts and

to dispose of the same to their own use, thereby causing and threatening to cause plaintiff great and irreparable harm and damage."

Defendants deny this allegation.

At the close of plaintiff's case in chief and just before resting, plaintiff moved to amend his complaint in a significant particular. The complaint up to that time had stated, as copied supra, that it was agreed that in determining the net profits of said business "the amounts payable thereto by patients for *professional services rendered by plaintiff*" should be included in the receipts and that "plaintiff's percentage of said net profits should include said agreed percentage of such amounts payable." (Italics ours.) The amendment was allowed by the court over defendants' objection. It changed the word "plaintiff" to the word "defendants" so as to make the alleged agreement include amounts payable to the business "by patients for professional services rendered by defendants" instead of for professional services rendered by plaintiff. The propriety of this amendment will be considered later.

It is claimed that plaintiff has no plain, speedy and adequate remedy at law, which is denied, and the prayer is for an accounting and judgment for profits and for $1,041.66 as damages on account of dismissal without giving the 30-day notice.

The trial court entered a decree awarding plaintiff $5,048.58 as plaintiff's share of the net profits, together with interest, but made no award of damages on account of the alleged dismissal of plaintiff without giving 30 days notice. The plaintiff has not appealed and the last-mentioned claim for damages is out of the case.

The issue relates to the meaning of "40% of the

net profits of said business." We have set forth the plaintiff's claim as to the agreement. To the contrary the defendants deny that there was any agreement that in determining net profits the amounts payable (but not paid) for professional services rendered by defendants should be included for the purpose of determining the percentage due to plaintiff. Defendants affirmatively allege that the 40% of net profits was to be computed upon a cash basis and upon a proviso that plaintiff maintained the same level of credit accounts which existed when plaintiff entered the employment.

In performing our duty in a de novo trial of this suit, the following circumstances merit consideration. In the first place, the parties made the serious mistake of failing to reduce their agreement to writing. This failure is particularly unfortunate because of the intricacy of the alleged agreement testified to by the plaintiff. But the confusion is not limited to the testimony. It is apparent in the pleadings. Paragraph III of the complaint concisely sets forth the alleged agreement. Plaintiff was to receive $1,041.66 per month plus 40 per cent of the net profits. The complaint adds that "Plaintiff was so employed  *  *  *  according to oral agreement." Defendant admitted both allegations. If that was the contract, then it was a simple matter to ascertain the net profits under ordinary business practice. But in the tenth paragraph of the complaint the allegations are substantially to the effect that under the agreement "net profits" did not mean net profits as that term is generally understood, but had an entirely different meaning, and that the amounts payable by patients for professional services rendered should be deemed net profits—in other words, that claims for money due should be treated as money received—an

intriguing type of "net profit" apparently known only to credit dentists. It will be observed that the allegations of paragraph "X" completely fail to say over what period accounts receivable should be treated as "net profits." One might ask, "Were the accounts receivable standing on the books of account on the day that plaintiff entered on his employment in August 1951 to be considered, or the accounts receivable when he quit the job on October 24, 1953? Or was it intended by the pleader to say that the difference between the amount of accounts receivable when he started the job and the amount of such accounts when he quit should represent the measure of net profit? The complaint gives no hint as to the answer to these questions, and as a result, the terms of the alleged contract are left indefinite. The case is further complicated by the fact that the original complaint which remained unamended until plaintiff had introduced his evidence and rested, contained the allegation that the amounts payable to the business for professional services rendered by the *plaintiff* should be included as receipts for the purpose of determining net profits, and then immediately before the commencement of defendants' case the court permitted an amendment changing "plaintiff" to "defendants" so that the allegation then was that amounts payable for professional services rendered by defendants should be so included. This amendment may have been made so as to permit plaintiff to claim some benefit from accounts receivable on the books on August 1951 when he entered the employment.

■ We have doubts as to the propriety of the ruling of the court permitting the amendment. In view, however, of the wide discretion vested in the courts, we decline to hold that there was reversible error. But we are warranted in inferring that the plaintiff him-

self was far from clear as to the details of the alleged contract. We also observe that this case, in spite of the immense volume of testimony taken, depends simply on two questions, (1) what was the agreement of the parties as to the measure to be applied in fixing plaintiff's compensation, and (2) what result is obtained by applying that measure to the facts? The court decided the question as to the terms of the contract and appointed an expert accountant to find the facts concerning "net profits" as defined, if it was defined. The only witnesses who gave any testimony as to the terms of the contract were the plaintiff and the defendant Miller. The defendant denied that the contract was as plaintiff claimed. The credibility of neither party was impeached, and again we have grave doubts as to whether there ever was a meeting of the minds on the terms of the contract.

We pause to set forth the facts concerning the work of the accountant, Mr. Lesher. The parties by written stipulation consented that the court should appoint Mr. Lesher, a certified public accountant, as referee

"for the purpose of ascertaining the operating expenses and cash receipts of defendants' certain dental business, known as Dr. J. C. Campbell, Dentist, 359 S. W. Morrison Street, Portland, Oregon, during the period August 17, 1951, to and including October 24, 1953, and of ascertaining the accounts receivable of said business as of October 24, 1953."

Pursuant to the stipulation, the court made the appointment of Lesher as "referee"

"to determine the costs, charges and expenses of operating defendants' certain dental business known as Dr. J. C. Campbell, Dentist, 359 S. W. Morrison Street, Portland, Oregon, during the period August 17, 1951, to and including October 24, 1953, and to determine the cash receipts of said business during

said period and to determine the amount of accounts receivable of said business as of October 24, 1953, and

"IT IS FURTHER HEREBY ORDERED, ADJUDGED AND DECREED that all costs, charges and expenses incurred by said referee in this reference shall be added to and become a part of prevailing party's cost bill herein."

Lesher did not act as a referee. He took no sworn testimony, but he and his staff examined the accounts of the so-called Campbell dental office and prepared a comprehensive report. The plaintiff offered the report and it was received in evidence. The parties stipulated that the report was correct. There was considerable testimony as to items which should or should not have been added or subtracted from the figures of the accountant, but we decline to go behind the report. We here set forth Exhibit "A" of the Lesher report concerning which the plaintiff testified, as will later appear:

"RAY H. LESHER CO.
Certified Public Accountants and Auditors
Portland, Oregon

DR. J. C. CAMPBELL, DENTIST
Portland, Oregon

Statement of Income and Expense
For the Period August 17, 1951 to October 24, 1953

Receipts:

| | | |
|---|---|---|
| Professional Services | $75,218.01 | |
| Refund of Overpayment of Expenses | 56.00 | |
| Total (Schedule 1) | | $75,274.01 |

Expenses:

| | |
|---|---|
| Salaries | $38,950.46 |
| Advertising | 13,301.82 |
| Supplies | 7,987.81 |
| Rent | 6,500.00 |
| Extraction Service | 3,970.00 |
| Utilities | 2,498.04 |
| Depreciation | 1,113.47 |
| Miscellaneous | 3,945.44 |

| | |
|---|---|
| Total (Schedule II) | 78,267.04 |
| Net Loss Computed on Cash Basis | $ 2,993.03 |
| Add, Net Accounts Receivable Balance October 24, 1953 | 15,791.00 |
| Total | $12,797.97 |
| Deduct, Net Accounts Receivable Balance August 17, 1951 | 22,141.12 |
| Net Loss Computed on Accrual Basis | $ 9,343.15 |
|  | ” |

This is the factual basis on which the court rendered a decree for the plaintiff in the sum of $5,048.58, with interest. In its verbal opinion rendered at the close of the case, the court said, "Apparently this dental office that they were operating here was going in the hole." The formal decree, however, recited

"that defendants agreed to account to plaintiff for his agreed share of the accounts receivable of their * * * dental business, * * * and that they agreed to pay plaintiff a fixed salary together with a certain percentage of the accounts receivable of said business and that heretofore they have paid plaintiff said agreed fixed salary, but they have failed and neglected to pay him said agreed percentage, and further finding generally that there is now due and owing from defendants unto plaintiff, as said percentage, the sum of 40% of $12,621.44, or the sum of $5,048.58, together with interest

thereon at the rate of 6% per annum from October 24, 1953, until paid;

"* * *."

Turning to the evidence, the plaintiff called the defendant Miller as an adverse witness. Dr. Miller testified that plaintiff was to receive 40 per cent of the net profit, and he testified that net profit meant "net profits on a cash basis" after deducting all operating expenses. He testified, "there was nothing ever mentioned about the credit accounts * * *." He explained that the credit accounts, were however, relevant. He testified:

"Yes, it would figure in it this way, the larger that the credit structure is built up the more cash would come in; therefore, increasing his net profits. If the credit structure decreased that would mean a lesser amount of cash coming in, which would decrease the amount of profits or even put it in the hole."

The defendant Miller was then asked concerning what appears to be a term of art in the credit dentist business. The term is "the book." As to the meaning of "the book", the testimony appears to us to be in confusion worse confounded. Defendant testified:

"Q — the book would be a sum in excess of accounts receivable?

"A The book would be, as nearly as I can compute it, would be the total amount after the deductions are made at the end of each month.

"Q You mean deductions for bad debts and uncollectible items?

"A Bad debts, uncollectible debts, work not completed."

Again, we quote:

"Q How does the book differ from accounts receivable?

"A Well, in the ledger whenever—whenever a

contract is completed, wherever the work is completed, that amount is definitely due as per agreement. If the work is not completed only the amount of work that has been completed could be considered accounts receivable.

"Q So that the book is something in excess of accounts receivable?

"A Always; always."

Apparently "the book" included the amount of the contracts for work to be performed in the future as well as "accounts receivable", i.e., claims for work already performed.

The plaintiff's testimony first given covers the conversation with defendant Miller as to "what the deal would be." We quote:

"A He said he would pay me twelve thousand five hundred * * * plus 40 per cent of the net profit.

* * * * *

"* * * I asked him what did he mean by net profits. I said, 'We discussed about what you mean by the book and all that.' I says, 'What do you construe net profits to be?' And he says, 'That is the book, or the accounts receivable, less any actual cash loss or plus any actual cash gain during any of the contractual period.'

"Q Did I understand you to say you also discussed the book?

"A Yes.

"Q What was your discussion relative to that?

"A Oh, it was about—it was mainly just the fact that the book was the accounts receivable. * * *"

Later in his testimony plaintiff gave a somewhat different account of the alleged agreement. Thereafter plaintiff's attention was directed to Exhibit "A" of Lesher's report and plaintiff was asked to state "to

what under your contentions in this case you would be entitled?" The plaintiff answered, "Well, I should be entitled to the 40 per cent of this item, $12,797.97." On cross examination plaintiff was asked:

"Q * * * you already claim an interest in the contracts receivable at the time you left?

"A That is right.

"Q Are you claiming an interest in the accounts receivable at the time you entered the office?

"A I am claiming an interest in all of the accounts receivable. * * *"

Again he testified:

"A We have $22,141.12 when I went in; we have $15,791 when I went out. I am claiming 40 per cent of the $15,791 which is—which is what the 'book' is."

At one point plaintiff claimed that under the agreement as he construed it he was entitled to 40 per cent of $12,797.97, and again, he claimed 40 per cent of $15,791. We think the plaintiff was badly confused, and in fact, we have concluded that owing to the loose talk and failure to specifically define the terms of the agreement there was no meeting of the minds of the partners. Exhibit "A" sponsored by both parties shows a net loss on a cash basis of $2,993.03 over the period of plaintiff's employment and a net loss computed on an accrual basis of $9,343.15. It would require a more persuasive showing than was made here to convince us that plaintiff was entitled to a net profit of $5,048.58 or any other sum.

As shown by the evidence, the amount of contracts with patients for work done and to be done would directly affect the amount of cash that would come in and thus would affect the amount of net profit if any, coming to plaintiff. In this way only the "book" was

important. Referring to the figure of $12,797.97 which appears in Lesher's Exhibit "A", plaintiff testified:

"Q In other words, to arrive at that $12,797 you feel there should be included in this the amount of net accounts receivable, the balance of October 24th, 1953?
"A That is right.

"Q Now, that figure, then, includes what you term the 'book'—
"A The 'book'.

"Q — being the amount of the total of the face value or the face amount of all the contracts outstanding; right?
"A That is right."

If the net accounts receivable shown in Exhibit "A" included the amount of contracts for work, some of which had been performed and some of which was yet to be performed, we would have still greater difficulty in finding any "net profit." Plaintiff himself testified in reference to the net amount $15,791 in Exhibit "A" that the work was all performed strictly up to date, "I would say with possibly—oh within five hundred or a thousand dollars."

■ Plaintiff has failed to establish the exact terms of the contract which he alleged, and has failed to show that there was any net profit either on a cash basis or on an accrual basis. The decree and judgment must be reversed.

■ There remains for determination the matter of plaintiff's cost bill as approved by the circuit court. The defendants objected to an item of $2,035 which was allowed as referee's fees, after a hearing which occupied 100 pages of the transcript. The question now arises as to whether the "referee" is entitled to have his compensation fixed in this case, and if so, who

should be required to pay it, and how much. The record on this shows that although the court appointed Lesher a referee, he never served as such and cannot be compensated as such, but it also shows that he was appointed pursuant to stipulation of the parties and that with the approval of both parties he acted as an accountant and made a report which was stipulated to be correct. He is entitled to be paid and he must be paid by the parties. The stipulation of the parties made no provision as to how the cost of the audit should be paid. The trial court, however, provided that the cost of the referee should become a part of the prevailing party's cost bill. The hearing on objections to this item of the cost bill consumed 116 pages of the transcript. The trial court considered the evidence and approved the item in the cost bill amounting to $2,035. There were no objections to other and minor items in the cost bill.

The trial court imposed the entire costs, amounting to $2,103.58, upon the defendants. In view of the reversal of the case under the circumstances disclosed by the record, we hold that the costs in the circuit court shall be paid by the plaintiff and defendants share and share alike, that is to say, that plaintiff pays as costs the sum of $1,051.79, and the defendants shall pay a like sum.

Defendants-appellants shall recover their costs in this court.